# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | | |
| **v.** | | **1:16-cr-99-WSD** |
| **BENNETT L. KIGHT,** | | |
| **Defendant.** | | |

## OPINION AND ORDER

This matter is before the Court on the Government's Motion to Disqualify Defense Counsel [45] (the "Motion"). Also before the Court is Defendant Bennett L. Kight's ("Defendant" or "Kight") Unopposed Request for Oral Argument on the Government's Motion to Disqualify Defense Counsel [55].[1]

## I. INTRODUCTION

The Government moves to disqualify Barry J. Armstrong and his law firm, Dentons US LLP ("the Firm") from representing Kight in this criminal action, on

---

[1] The Court determines that oral argument is not necessary. Defendant does not identify the issues he contends were raised for the first time in the Government's Reply, and Defendant's claimed "worsening mental health issues" have been the subject of extensive briefing and communications with the Court since Defendant requested oral argument. The Court further notes that the "complex facts and issues implicating federal, state, and constitutional law" have been adequately and, the Court beliefs, accurately, addressed by the parties in their briefs and submissions. Defendant's request for oral argument is denied.

the grounds that Armstrong represented Kight and William Lankford in a state court civil action (the "Civil Action") that was substantially related to the charges brought against Kight in this case. Both parties represent that they will call Lankford to testify about matters central to this prosecution and which the Government argues are substantially related to the matters about which Armstrong represented Lankford and Kight in the Civil Action—a representation for which Lankford refuses to waive his attorney client privilege or confidential information privilege.

The Government claims specifically that the transaction at issue in this case was at issue in the Civil Action and thus the cases are substantially related and disqualification is required. Kight contends the transaction at issue in this case was not at issue in the Civil Action, that it was not discussed with Lankford and thus these two cases and the issues in them are not substantially related. To understand the relationship between the issues in this prosecution and in the Civil Action, the Court first evaluates the complex network of entities and transactions in which Kight and Lankford were involved as co-trustees of certain estate assets and the litigation in state court that arose from Kight's position as a co-trustee.

## II. BACKGROUND

From 1991 to 2004, Frances Bunzl and Kight were co-trustees of three trusts created for the benefit of certain members of the Bunzl family[2] (the "Bunzl Trusts"). (Civil Action, Petition for Approval of Interim Accounting [54.3] at 6-7). Kight, besides serving as co-trustee with Frances Bunzl, also served as the Bunzl family's attorney and managed other Bunzl family assets that are not held in the Bunzl Trusts.

In December 2004, Frances Bunzl resigned as co-trustee and Lankford was appointed to serve with Kight as co-trustee of the Bunzl Trusts. (Id. at 7). Lankford also provided accounting and tax services to the Bunzl family, and, with Kight, managed other Bunzl family assets.

### A. The 2005 Bunzl Asset Reorganization

In July 2005, Kight and Lankford "undertook significant family planning involving the [Bunzl] Trusts and members of the Bunzl family" (the "2005 Bunzl Asset Reorganization"). (Id.). This plan "relied upon the creation and utilization of a series of family limited liability companies for the purpose of diversifying the holdings of all of the parties and entities . . . ." (Id. at 8). Two of these new "family limited liability companies" were Capital Piedmont Investment

---

[2] The Bunzl family is wealthy with a variety of business and real estate holdings.

Company I, LLC ("CPIC I") and Capital Piedmont Investment Company II, LLC ("CPIC II"). CPIC I and CPIC II were funded through a series of transactions in which Frances Bunzl contributed approximately $30 million of her own assets. One asset she contributed was her interest in WBT Properties Management Limited Co. ("WBT Properties"). The contribution was not directly to CPIC I and CPIC II. A new entity, Park Place Investments ("Park Place") first was created and it was this entity to which Frances Bunzl transferred her interest in WBT Properties and the other assets comprising the $30 million she committed to fund CPIC I and CPIC II. ([48.7]; [34.3]). Park Place thereafter contributed $14 million to CPIC I and $14.5 million to CPIC II. Capital Holdings WHB, LLC ("WHB"), which was owned by the Bunzl Trusts, contributed $10 million to CPIC I and $10 million to CPIC II. As a result, CPIC I received $24 million and CPIC II received $24.5 million in assets from Frances Bunzl and the Bunzl Trusts.

Kight also contributed to CPIC I and CPIC II, but not in cash or other property. Kight's contribution consisted of notes payable to the entities. Kight executed a note in the amount of $1 million to CPIC I and a note in the amount of $500,000 to CPIC II. Those who provided funding to CPIC I and CPIC II received, in return, controlling ("Class A") units and non-controlling ("Class B") units. The owners of Class A units were entitled to receive the first 15% of the

post-contribution gains realized from the sale of properties in each company, provided there was sufficient cash flow to fund the payments. ([34.3]). Park Place, WHB and Kight all received Class A and Class B units in CPIC I and CPIC II.

Kight and Lankford also formed Capital Piedmont Management Company LLC ("Management LLC") to manage the newly created Park Place, CPIC I and CPIC II.[3] Kight and Lankford owned and controlled Management LLC in their individual capacities. As part of the Bunzl Asset Reorganization, Management LLC acquired from Park Place and WHB all of their Class A units in CPIC I and CPIC II.[4] Kight and Lankford were supposed to pay 10% of the purchase price for the Class A units in cash. The cash payment was deferred until the fair market value appraisal was available.[5] In return for the Class A units acquired, Management LLC gave to Park Place and WHB promissory notes based on the fair market value of the Class A units transferred. As a result, Management LLC—and its owners, Kight and Lankford—initially, and perhaps ultimately, obtained

---

[3]     Kight and Lankford created Park Place, CPIC I and CPIC II in the Bunzl Asset Reorganization.

[4]     Management LLC also acquired all of Frances Bunzl's Class A units in Park Place, in exchange for a promissory note from Management LLC to Park Place. Management LLC thus obtained operation control of, and a 1% economic interest in, Park Place. ([34.3] at 2).

[5]     It is not clear when the appraisal was completed, assuming it was, or for what value the shares were appraised.

operational control of CPIC I and CPIC II, an economic interest in CPIC I and CPIC II,[6] and the right to participate in the first 15% of the profits generated by CPIC I and CPIC II, in exchange for their promissory notes.[7]

The chart in Attachment 1 summarizes the 2005 Bunzl Asset Reorganization.

B.    Transactions Involving the Glen Arden Property

On January 10, 2006, some months after the Bunzl Asset Reorganization, Kight told Lankford that he would "like to get [his] notes for [his] investments in the CPIC entities paid off" and he sent Lankford a draft of a purchase agreement for a residence on Glen Arden Place in Atlanta (the "Glen Arden Property"). ([45.2] at 2).  The Glen Arden Property was Kight's residence and, according to the property records, Kight's wife, Judith, was the record owner of the Glen Arden Property.

Kight told Lankford that one of the Bunzl entities would pay him $2 million for the Glen Arden Property, and Kight "would use all of that plus to pay off [Kight's] CPIC notes and interest and the Glen Arden [Property] mortgage."  (Id.). Lankford said he was "in agreement with moving forward."  (Id.).

---

[6]    Management LLC obtained a .60% economic interest in CPIC I (.56% from Park Place, plus .4% from WHB); and .62% economic interest in CPIC II (.58% from Park Place, plus .4% from WHB).  ([34.3] at 2).

[7]    It is not clear if Kight and Lankford ever paid their 10% cash obligation.

On January 26, 2006, Kight formulated the Glen Arden Property transaction at issue in this case. Kight purported to sell the Glen Arden Property for $2 million to Capital Holdings GAP 400 LLC ("Capital Holdings GAP"), a new Bunzl entity Kight had created and for which Lankford was a manager. Kight represented in the transaction documents that the Glen Arden Property was owned by an entity named SCT Holdings 400 GAP LLC ("400 GAP LLC"), and that another entity, SCT Holdings LLC ("SCT Holdings") owned 100% of the membership of 400 GAP LLC. ([34.4]; [45.4]). Kight structured the Glen Arden Property transaction by having Capital Holdings GAP enter into an agreement with SCT Holdings to purchase SCT Holding's 100% member interest in 400 GAP LLC. (Id.). This purchase arrangement was embodied in transaction documents drafted by Kight. Lankford signed the purchase agreement on behalf of Capital Holdings GAP.[8] (Id.). To conclude the purchase, Kight sent two wire transfers, totaling approximately $2 million, from WBT Properties,[9] to Kight's firm's escrow

---

[8]     Kight signed the purchase agreement as "manager" of "Fife Holdings LLC," an entity owned by Kight. ([42.1] at 3 & Ex. 2; [45.2]). The relationship between "Fife Holdings" and the other entities is not clear.

[9]     WBT Properties is not a party to the purchase agreement and it is not clear why the Glen Arden Property transaction was funded by WBT Properties. It appears that WBT Properties was, at least at some point, the owner of several other LLCs worth millions of dollars. The receiver in the Civil Action referred to WBT Properties' bank account as "the transaction activity account that was used kind of

account. ([45.4]). Kight used these funds to pay off the mortgage on his Glen Arden residence, and to repay his promissory notes to CPIC I and CPIC II. ([45.2], [45.5]). There is no recorded deed transferring the Glen Arden Property from Judith Kight to 400 GAP LLC.

The chart in Attachment 2 summarizes the 2006 Glen Arden Property transaction.

About two years later, Kight dissolved 400 GAP LLC and Capital Holdings GAP. ([45.6]). The following year, in 2009, Kight and his son, Robert Kight, formed a new company, Sussex Park LLC ("Sussex Park"). ([45.7], [45.8]). Kight pledged the Glen Arden Property to Sussex Park as his capital contribution to it. Kight did not disclose to Robert Kight the 2006 sale of the property to Capital Holdings GAP. Kight represented that Judith Kight was still the record owner of the Glen Arden Property. ([45.8]; Superseding Indictment [15]).

In December 2010, Kight caused a deed to be prepared purporting to show a transaction occurring on July 28, 2005, before the transfer of the property to Capital Holdings GAP, in which the Glen Arden Property was deeded by its record owner, Judith Kight, to Glen Arden Place LLC (not 400 GAP LLC or Capital Holdings GAP), a company owned and controlled by Kight. Glen Arden Place

prior to the 2005 [Bunzl Asset Reorganization]" and "the starting place initially for [his] review." ([45.19]).

LLC was not involved in the 2006 sale of the property to Capital Holdings GAP. (Id.).

On March 21, 2011, Kight caused the deed transferring ownership of the Glen Arden Property from Judith Kight to Glen Arden Place LLC to be recorded and returned to him by United States Mail. The Superseding Indictment alleges that when Kight drafted the deed showing the transfer from Judith Kight on July 28, 2005, he knew that the deed would be used by Robert Kight to obtain a mortgage on the Glen Arden Property, and that the mortgage lender would rely on publicly-recorded deeds, including the backdated deed, to approve Robert Kight's mortgage application. (Superseding Indictment ¶¶ 12, 14-17). Robert Kight ultimately moved into the Glen Arden Property.

The chart in Attachment 3 summarizes the later Glen Arden Property transactions.

C.    The Civil Action

In 2012, the Bunzl family began questioning Kight's and Lankford's administration of the Bunzl Trusts and stewardship of other Bunzl assets. On February 8, 2013, Kight and Lankford, represented by the Gaslowitz Frankel law firm, filed a Petition for Approval of Interim Accounting in the Superior Court of

Fulton County. (Civil Action Petition [54.3]).[10] In their Petition, Kight and

Lankford asserted that they provided the trust beneficiaries with accountings for

the Bunzl Trusts for 2004, 2005, 2010 and 2011, and they sought approval of their

Interim Accounting, a finding that their administration of the Bunzl Trusts was

proper, and they requested to be relieved of any liability based on their

administration of the Bunzl Trusts. (Id. at 9, 12).

On March 13, 2013, Frances Bunzl and the beneficiaries of the Bunzl Trusts

(together, the "Bunzl Family") filed their Response, Counterclaim and Third Party

Complaint ("Counterclaim") in the Civil Action. ([54.4]). The Bunzl Family

brought claims against Kight and Lankford for, among others, breach of fiduciary

duty, fraud, and state law RICO violations, based on their alleged mismanagement

of, and self-dealing in, Bunzl assets, including those belonging to the Bunzl Trusts.

The Bunzl Family alleged that Kight and Lankford formed various limited liability

companies, including those involved in the 2005 Bunzl Asset Reorganization and

the Glen Arden Property transactions, to conceal their theft of Bunzl assets and

Kight's self-dealing. (See Counterclaim at 31, 35-36). The Bunzl Family alleged:

---

[10] The Respondents in the Civil Action were Suzanne Bunzl Wilner and Anna Wilner, the only beneficiaries of the Bunzl Trusts. Frances Bunzl was not named as a Respondent because she is not a lineal descendant of Walter Bunzl and thus not a beneficiary of the Bunzl Trusts.

- Kight and Lankford "have caused to be created over 100 entities relating to the Bunzl Trusts and other Bunzl assets in which [the Bunzl Family] have an interest. (Counterclaim at 18).

- Kight and Lankford "concealed their activities by failing to provide [the Bunzl Family] with any accountings concerning the Bunzl Trusts [and other Bunzl Family assets] for the years 1991 . . . [through] 2011." (Id.).

- These entities Kight and Lankford caused to be formed ("Bunzl Entities") include:

  - Capital Holdings GAP;

  - CPIC I;

  - CPIC II;

  - Management LLC;

  - Glen Arden Place LLC;

  - Park Place;

  - 400 Gap LLC;

  - SCT Holdings;

  - Sussex Park; and

  - WBT Properties (Id. at 30-36).

- Kight and Lankford "formed a significant number of the Bunzl Entities without [the Bunzl Family's] informed consent, and to this day, [the Bunzl Family] are not certain of the assets that each entity owns and the purpose of most of the entities." (Id. at 36).

- Kight and Lankford "formed numerous entities to conceal their actions, breaches of trust, breach of fiduciary duties, self-dealing, conversion of Bunzl assets to their ownership, [and] theft of Bunzl assets." (Id.);

- "Kight, with the knowledge, cooperation and/or complicity of [ ] Lankford, caused the Bunzl Trusts or Bunzl Entities to acquire numerous parcels of residential real property in Georgia and North Carolina." (Id. at 55).

- "Kight, with the knowledge, cooperation and/or complicity of [ ] Lankford, has used assets of the Bunzl Trusts, Bunzl Entities, [and the Bunzl Family] to purchase and/or maintain properties, from which [ ] Kight, his family, and his associates have received personal benefit and to which they have unlawfully taken ownership interests." (Id. at 55; see also id. at 68).

The Bunzl Family also filed a Motion for Immediate Interlocutory Injunction, seeking to remove Kight and Lankford from their administration of, and to compel them to fully disclose, all Bunzl assets. ([54.5]).

On March 20, 2013, Kight and Lankford met with Armstrong to discuss the possibility of Armstrong jointly representing them. On March 25, 2013, Kight and Lankford retained Armstrong to represent them in the Civil Action. The Engagement Letter [48.1 at 9-11], between Armstrong, his Firm,[11] Kight and Lankford, confirming the joint representation provided:

> In consideration of [the Firm's] acceptance of this engagement, you agree that [the Firm] may in the future represent existing or new clients in any matter involving or related to you including, without limitation, litigation against you, and other matters directly or

---

[11] At the time of the joint representation, Armstrong was a Partner at McKenna Long & Aldridge LLP. In June 2015, McKenna Long & Aldridge LLP merged with Dentons US LLP. (See [48.1] at ¶ 3).

indirectly adverse to the interests of you, *so long as those matters are not substantially related to this representation or to any other matter on which you engage [the Firm].*

. . .

We have agreed to represent each of you, jointly, in this matter. After discussing the matter with each of you, including the advantages and risks of joint representation, we believe that joint representation is appropriate. Nevertheless, it is possible that during our representation, unanticipated facts would come to light which would make it inadvisable to continue joint representation. In such event, we might have to withdraw from the representation of one or both of you if our ability to exercise our independent judgment on behalf of each of you would be adversely affected. Under such circumstances, we reserve the right to determine in our discretion which party to continue to represent. *In the event the firm withdraws from representing either of you, both of you agree to waive any conflict arising from our continued representation of the other client adverse to you and you agree not to seek to disqualify the firm from continuing to represent the remaining client.*

(Engagement Letter at 2-3) (emphasis added).

On May 6, 2013, Armstrong, on behalf of Kight and Lankford, sent a letter to the judge in the Civil Action proposing that, instead of removing Kight and Lankford as trustees, the court "appoint[] a receiver to: (1) fully investigate and report on the assets of the Trusts at issue in this litigation; and (2) fully investigate and report on all payments received by [Kight and Lankford] in either their capacity as Trustees or as managers of corporate entities in which the Trusts have an ownership interest." ([45.10]). Armstrong argued that "[t]he fundamental

dispute in this litigation centers on allegations that [Kight and Lankford] have stolen or wrongfully depleted assets of the Trusts" and the "most efficient process to resolve this dispute is the appointment of [a receiver] to conduct a comprehensive forensic audit of the assets of the Bunzl Trusts and the related corporate entities." (Id.).

On May 15, 2013, Armstrong appeared on behalf of Kight and Lankford at a hearing on the Bunzl Family's Motion for Immediate Interlocutory Injunction and argued that Kight and Lankford should not be removed from their positions managing the Bunzl Trusts and assets. On June 10, 2013, the court in the Civil Action denied the Bunzl Family's motion, and appointed a receiver to conduct an accounting of the Bunzl assets. (See [45.13]).

On June 25, 2013, Armstrong sent the receiver "all statements . . . with respect to all accounts containing stocks, bonds or cash that are directly or indirectly owned or controlled by the Trusts or owned or controlled by entities in which the Trusts have an ownership interest." ([45.13]). Armstrong also produced a schedule "identifying all of the real estate in which the Trusts have an ownership interest" showing, for each property, "its record owner as of December 31, 2012, and its address, city and state." (Id.).

On July 18, 2013, Lankford obtained representation in the Civil Action, provided by his employer's insurance company, and the Firm's representation of Lankford ended. (Armstrong Decl. [48.1] at ¶ 7). Armstrong asserts that "at no time during the joint representation did a circumstance arise where the Firm concluded it had a conflict of interest, or potential conflict of interest . . . that would obligate the Firm to withdraw from the representation of either Lankford or Kight . . . ." (Id. at ¶ 6). Armstrong asserts that "[d]uring the four month period the Firm represented Mr. Lankford jointly, the main activity in the civil litigation involved answering and moving to dismiss the claims filed by the Bunzl family, and preparing for and participating in an injunction hearing to remove Mr. Kight and Mr. Lankford as Trustees of certain Trusts." (Id. at ¶ 8).

On May 6 and June 26, 2014, after their joint representation ended, the receiver interviewed Lankford and Kight together. The receiver asked about several specific money transfers that he identified in bank records produced by Kight and Lankford, but for which he could not identify a purpose. Although the receiver did not know it, these transfers related to the Glen Arden Property. After the interview, Lankford attempted to reconstruct the fund transfers and realized that they related to the Glen Arden Property transaction. Lankford discussed the Glen Arden Property transaction with Kight, and Lankford claims only then did he

learn the details of the Glen Arden Property transaction involving Capital Holdings GAP, SCT Holdings and 400 GAP LLC.  (See Gov. Mot. at 6-7; Kight Resp. [48] at 15-16).

On August 1, 2014, counsel for the Bunzl Family in the Civil Action sent a letter to the United States Attorney for the Northern District of Georgia.  The letter describes the Civil Action and urges the Government to investigate Kight's handling of the Bunzl Trusts and assets.  ([48.9]).

On May 11, 2015, Lankford resigned as co-trustee of the Bunzl Trusts.  On May 21, 2015, the judge in the Civil Action issued his order finding that, under Georgia law, good cause exists to remove Kight from his position as co-trustee of the Bunzl Trusts.[12]

On January 8, 2016, during the Government's investigation, Kight moved to stay the Civil Action, arguing that the Government's "criminal investigation involves the same issues that form the basis" of the Civil Action.  ([54.1]).  On April 4, 2016, after he was indicted in this criminal case, Kight renewed his motion to stay the Civil Action.  ([54.2]).  The Civil Action currently is stayed.

---

[12]     See May 21, 2015, Order, available online at: Georgia Business Court Opinions, Paper 346, http://readingroom.law.gsu.edu/businesscourt/346.

D.    The Criminal Case

On March 16, 2016, a federal grand jury returned an indictment [1] charging Kight with one count of mail fraud, in violation of 18 U.S.C. § 1341, based on the Glen Arden Property transaction.

On March 24, 2016, the Government interviewed Lankford after it granted him immunity.  (Gov. Mot. at 9; [48.4]).  During the interview, Lankford stated that he first learned the details of the Glen Arden Property transaction in May 2014, after he was interviewed by the receiver in the Civil Action.

On May 18, 2016, the grand jury returned a Superseding Indictment [15] charging Kight with one count of mail fraud, in violation of 18 U.S.C. § 1341 (Count One), and one count of bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (Count Two).

On June 7, 2016, the Government produced to defense counsel a summary of its March 24, 2016, interview with Lankford.  (Gov. Mot. at 9).

The Government asserts it first learned, on November 7, 2016, that Armstrong had represented Lankford in the Civil Action.[13]  The Government

---

[13]    On July 21, 2016, the Government told Armstrong that he may be an unsworn witness at trial, based on his personal involvement in some of the events that occurred in the Civil Action.  In discussing this possibility with Armstrong, the Government represents Armstrong did not mention that he had also represented Lankford in the Civil Action.  (Gov. Mot. at 10).

discussed the issue with Armstrong and, on November 13, 2016, Armstrong

produced a copy of the Engagement Letter.  On November 14, 2016, the

Government raised the potential conflict with the Court at a status hearing.  (Id. at

10).

On November 14, 2016, Lankford's current counsel, in response to the

Government's question, told the Government in an email that Lankford "will NOT

voluntarily waive his attorney-client privilege as to Mr. Armstrong and his law

firm or consent to the use of confidential information by same." ([48.10]).

On December 19, 2016, the Government moved to disqualify Armstrong and

the Firm from representing Kight in this prosecution.

On February 23, 2017, Kight moved to stay proceedings in this criminal case

to determine whether he is competent to stand trial.  ([59]).  The Court granted

Kight's motion and appointed an expert to evaluate Kight.  ([63], [74]).

On September 6, 2017, the Court and the parties received the expert's report.  On

September 13, 2017, the Court conducted a conference call to discuss the further

processing of this case, and permitted the parties to file responses to the expert

report.  The Court also lifted the stay, including to consider the Government's

Motion to Disqualify.  ([76]).

The Government moves to disqualify Armstrong and the Firm from representing Kight in this prosecution because Lankford, Armstrong's former client, will testify at trial. The Government argues that the Civil Action and this criminal case are substantially related, that Armstrong's prior representation of Lankford in the Civil Action precludes his representation of Kight here, and that Lankford has not, and will not, agreed to waive the conflict. In his September 25, 2017, Declaration, Lankford states: "I do not waive my attorney-client privilege as to Mr. Armstrong and his law firm . . . . Similarly, I do not consent to any use of my confidential information by Mr. Armstrong and his law firm . . . ." (Lankford Decl. [83.1] at ¶ 7).

Kight argues that disqualification is not appropriate because the Civil Action and this prosecution are not substantially related, including because Lankford did not learn the details of the Glen Arden Property transaction until 2014, almost a year after Armstrong's joint representation of Kight and Lankford ended. Kight argues that Armstrong and Lankford did not discuss the Glen Arden Property transaction during their attorney-client relationship, and thus it would be "impossible" for Armstrong to use confidential information learned from Lankford against him during cross-examination. Kight argues further that, under the terms of the Engagement Letter, Lankford waived any potential conflict of interest.

## III. DISCUSSION

### A. Legal Standard

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "[A]n essential part of that right is the accused's ability to select the counsel of his choice." United States v. Ross, 33 F.3d 1507, 1522 (11th Cir. 1994). "Thus, a criminal defendant has a presumptive right to counsel of choice." Id.

A defendant's right to the counsel of his choice is not absolute. "[W]hile the right to . . . be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." United States v. Campbell, 491 F.3d 1306, 1310 (11th Cir. 2007) (quoting Wheat v. United States, 486 U.S. 153, 159 (1988)). "The need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial." Id. (quoting Ross, 33 F.3d at 1523). "When an actual conflict of

interest exists, the client is denied effective assistance of counsel, and the attorney may be disqualified." Ross, 33 F.3d at 1523. "[E]ven a potential conflict suffices for disqualification." Id. (citing Wheat, 486 U.S. at 164 ("a showing of a serious potential for conflict" overcomes presumption in favor of defendant's counsel of choice)).

"In deciding whether the actual or potential conflict warrants disqualification, we examine whether the subject matter of the first representation is substantially related to that of the second." Ross, 33 F.3d at 1523. "Our goal is to discover whether the defense lawyer has divided loyalties that prevent him from effectively representing the defendant," including because of restrictions imposed by counsel's representation of a former client. Id.

> If the conflict *could* cause the defense attorney improperly to use privileged communications in cross-examination, then disqualification is appropriate. Indeed, it is also true that disqualification is equally appropriate if the conflict *could* deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client or to advance the attorney's own personal interest. In short, the court must protect its independent interest in ensuring that the integrity of the judicial system is preserved and that trials are conducted within ethical standards.

Id.

For a matter to be substantially related, it "need only be akin to the present action in a way reasonable people would understand as important to the issues

involved." United States v. Delorme, No. 07-20534-CR-SIMONTON, 2009 WL 33836, at *6 (S.D. Fla. Jan. 5, 2009) (quoting In re Corrugated Container Antitrust Litig., 659 F.2d 1341, 1346 (11th Cir. 1981)). "Where parts of the present action and past representation concern the very same subject matter, reasonable minds must agree they are substantially related." Corrugated Container, 659 F.2d at 1346.

B. Analysis

An analysis of the facts alleged in the charges against Kight in the Superseding Indictment, and Armstrong's and his Firm's representation of Kight and Lankford in the Civil Action, leads to the inescapable conclusion these matters are substantially related. Armstrong and his Firm entered into an attorney-client relationship with Kight and Lankford on March 25, 2013, to represent them in the Civil Action. That action involved a broad attack on Kight's and Lankford's performance of their fiduciary duties to the Bunzl Family and the administration of the Bunzl Trusts and other family assets.

The Counterclaim against Kight and Lankford alleged, among other things, the creation of entities by Kight and Lankford to mislead and disguise the truth of transactions for which Kight and Lankford were responsible. One of the several transactions at the center of the Civil Action was the one involving the creation of

new entities that enabled—and perhaps were the impetus for—the Glen Arden Property transaction. This transaction is at the core of the Government's prosecution against Kight, and plays a central role in Kight's defense in this criminal case. Armstrong represented Kight and Lankford in the Civil Action in which their transactions are questioned and he was retained to represent Kight in this prosecution knowing that Lankford is a key Government witness against Kight.

Armstrong's and his Firm's argument against disqualification is that he never discussed the Glen Arden Property transaction with Lankford, only represented him for four months in the Civil Action, and even if his representation in the Civil Action raised an issue of disqualification, Lankford in the Engagement Letter he entered into with Armstrong and his Firm, waived any conflict. This opposition is evasive of the disqualification issue before the Court.

Armstrong represented Lankford in the Civil Action from March to July 2013. Armstrong asserts that "[d]uring the four month period the Firm represented Mr. Lankford jointly, the main activity in the civil litigation involved answering and moving to dismiss the claims filed by the Bunzl family, and preparing for and participating in an injunction hearing to remove Mr. Kight and Mr. Lankford as Trustees of certain Trusts. There were no allegations in the claims asserted by the Bunzl family related to the Glen Arden [Property]."

(Armstrong Aff. at ¶ 8). Kight argues that the Civil Action and this criminal case are not substantially related because, during Armstrong's representation of Lankford, the Glen Arden Property transaction was not identified as an issue in the Civil Action. The Court disagrees. Kight's interpretation of these cases ignores the comprehensive claims against Kight and Lankford in the Civil Action, the attack on Kight's and Lankford's overall performance of their fiduciary duties, the claims they engaged in deceptive conduct in the duties they performed, and that the Superseding Indictment in this case involves a transaction discovered during the Civil Action.

In their Petition for Approval of Interim Accounting, Kight and Lankford describe the 2005 Bunzl Asset Reorganization, whereby they "undertook significant family planning involving the [Bunzl] Trusts and members of the Bunzl family," which "relied upon the creation and utilization of a series of family limited liability companies for the purpose of diversifying the holdings of all of the parties and entities . . . ." (Petition [54.3] at 8). Kight and Lankford provided the Trust Beneficiaries with accountings for the Bunzl Trusts for 2004, 2005, 2010 and 2011, and they sought approval of their Interim Accounting, a finding that their administration of the Trusts was proper, and they requested to be relieved of any liability based on their administration of the Bunzl Trusts for this period, which

necessarily includes actions taken as part of the 2005 Bunzl Asset Reorganization. (Id. at 9, 12). The Glen Arden Property transaction was enabled by, and related to, the reorganization.

In their Counterclaim, the Bunzl Family asserted claims against Kight and Lankford for, among others, breach of fiduciary duty, fraud and state law RICO violations, based on their alleged mismanagement of and self-dealing with Bunzl assets. The Bunzl Family alleges that Kight and Lankford formed a complex network of limited liability companies, specifically including by name those involved in the 2005 Bunzl Asset Reorganization—CPIC I, CPIC II, Park Place and Management LLC—and those that directly participated in the Glen Arden Property transactions—Capital Holdings GAP, SCT Holdings, 400 GAP LLC, WBT Properties, Glen Arden Place LLC, and Sussex Park—"to conceal their actions, breaches of trust, breach of fiduciary duties, self-dealing, conversion of Bunzl assets to their ownership, [and] theft of Bunzl assets." (Counterclaim at 30-36). The Bunzl Family further alleges that "Kight, with the knowledge, cooperation and/or complicity of [ ] Lankford, caused the Bunzl Trusts or Bunzl Entities to acquire numerous parcels of residential real property in Georgia" and "used assets of the Bunzl Trusts, Bunzl Entities, [and the Bunzl Family] to purchase and/or maintain properties, from which [ ] Kight, his family, and his

associates have received personal benefit and to which they have unlawfully taken ownership interests."  (Id. at 55).

This is exactly the type of conduct in which the Government alleges Kight wrongfully engaged and for which he is being prosecuted in this action.  The Government contends that Kight used his authority over Bunzl assets to obtain $2 million for his personal use and create a complex scheme of limited liability companies and transactions to conceal his actions.  The Government alleges that Kight created Capital Holdings GAP and 400 GAP LLC to "purchase" the Glen Arden Property, but later concealed the transaction by dissolved them and preparing a deed in which Judith Kight had transferred the Glen Arden Property to Glen Arden Place LLC before the "sale" to Capital Holdings GAP.  (See [34] at 7; [34.4]; [48] at 5).  Glen Arden Place LLC was created and owned by Kight, and the transfer permitted Kight to pledge the Glen Arden Property to Sussex Park, which Kight owned jointly with Robert Kight.  Robert Kight then moved into the Glen Arden Property and used his interest in the Glen Arden Property as collateral to obtain a mortgage.  This type of conduct, and specifically these entities, were squarely at issue even in the early stages of in the Civil Action.  As co-trustee, Lankford was intricately involved, and thus knowledgeable about, the details of the Bunzl Asset Reorganization, including the creation of new LLCs.

The record evidence shows that Kight told Lankford that he wanted to pay off his "investments in the CPIC entities," which Kight did by crafting the Glen Arden Property transaction. The Government alleges that Kight used the proceeds from the Glen Arden Property transaction to repay his promissory notes to CPIC I and CPIC II, which Kight obtained through the 2005 Bunzl Asset Reorganization. It is undisputed that the 2005 Bunzl Asset Reorganization is the centerpiece of the Civil Action, which included the consolidation of millions of dollars of Bunzl assets, including WBT Properties, into the newly-formed CPIC I and CPIC II, and the transfer of operational control of CPIC I and CPIC II to Kight and Lankford through Management LLC. That one of the motivations for the Glen Arden Property transaction was Kight's desire to repay his CPIC I and CPIC II promissory notes, and that he did so with funds he obtained from WBT Properties, compellingly shows the relationship between the two matters is substantial. The interrelationship of the claims and issues in the Civil Action with the charges and allegations in this prosecution are obvious, significant and intricate.

The 2005 Bunzl Asset Reorganization, and Kight's and Lankford's creation of various limited liability companies, have consistently been a component of Kight's defense in this case. Kight argues that, as part of the 2005 Bunzl Asset Reorganization, Ms. Bunzl sold her interest in WBT Properties, the company that

later funded the 2006 Glen Arden Property transaction. (See [48] at 5 n.1). Kight argues that WBT Properties was the real economic party in interest in the Glen Arden Property transaction, while the Government contends that Kight used WBT Properties as a shell company to conceal that he took money from Ms. Bunzl. (Compare id. at 5 n.1, 25; [34] at 3-6; [42] at 2-4; [42] with [30] at ¶¶ 1-2, 5-7; [45] at 3 n. 2). Kight argues further that a deed was not required to be recorded in connection with the Glen Arden Property transaction because the transaction was structured as one company simply buying the shares of another. That is, SCT Holdings merely sold to Capital Holdings GAP its interest in 400 GAP LLC, and a deed was not required to be recorded because 400 GAP LLC remained the purported owner of the Glen Arden Property. (See [48] at 5-6).[14]

The 2005 reorganization transaction and Kight's and Lankford's creation of limited liability companies were at issue in the Civil Action during Armstrong's representation of Lankford and they are front and center in this criminal case, including because Kight himself raises them and Lankford will testify about them. The Court concludes that the subject matter of Armstrong's representation of Lankford in the Civil Action is substantially related to the subject matter of his

_____

[14]      Kight fails to address why there is no recorded transfer of the Glen Arden Property to 400 GAP LLC. Rather, according to the property records, Judith Kight was the record owner of the Glen Arden Property until she transferred the Glen Arden Property to Glen Arden Place LLC.

representation of Kight in this case.  See Ross, 33 F.3d at 1523; United States

v. Henry, 307 F. App'x 331, 334-35 ("When a witness at trial was defended by an

attorney representing the defendant against charges related to an identical crime,

the attorney has an actual conflict of interest.") (citing Campbell, 491 F.3d at

1311); Corrugated Container, 659 F.2d at 1346 ("Where parts of the present action

and past representation concern the very same subject matter, reasonable minds

must agree they are substantially related.").

Kight next argues that, because Lankford did not learn the details of the

Glen Arden Property transaction until 2014, almost a year after Armstrong's joint

representation of Kight and Lankford ended, it would be "impossible" for

Armstrong to use confidential information learned from Lankford against him

during cross-examination.  That Armstrong seeks to marginalize the nature and

scope of his representation of Lankford[15] does not change that Armstrong

represented Lankford in a substantially related case.  The Eleventh Circuit has

consistently held that "once the former client . . . proves that the subject matters of

the present and prior representations are 'substantially related,' the court will

---

[15]     Armstrong claims that the allegations in the Civil Action "primarily relate to
the administration of certain Trusts" and "the allegations related to the Glen Arden
[Property] that [is] the subject of this criminal case never arose, and were never
discussed, with Mr. Lankford, Mr. Kight, or anyone else during the time the Firm
jointly represented Mr. Lankford."  (Armstrong Decl. ¶ 10).

irrebutably presume that the relevant confidential information was disclosed during the former period of representation." Henry, 307 F. App'x at 335 (quoting Freund v. Butterworth, 165 F.3d 839, 859 (11th Cir. 1999)). See also United States v. Culp, 934 F. Supp. 394, 398 (M. D. Fla. 1996) (rejecting counsel's assertion that "due to the limited nature of his representation of [a former client], he learned no information during the course of that representation which he could now use against [his current client]"); United States v. Cordoba, No. 12-20157-CR, 2013 WL 5741834, at *12 (S.D. Fla. Oct. 17, 2013) (although attorney claimed "there was a 'zero risk' that he would divulge any of [his previous client's] confidences" during cross-examination, "this assurance is inadequate to preclude disqualification"); cf. Jones v. InfoCure Corp., No. 1:01-cv-2845-TWT, 2003 WL 22149656, at *4 (N.D. Ga. May 13, 2003) ("If the 'substantial relationship' test is met, the Court is to assume that confidences were disclosed during the course of the prior representation and will not so inquire."); Green v. Montgomery Cty., Ala., 784 F. Supp. 841, 844 (M.D. Ala. 1992) ("The court will not inquire into whether the former client in fact made confidential disclosures to the attorney or whether the attorney is in fact likely to use the damaging disclosures to the detriment of his former client. . . . If the court were to probe further into the question of whether the attorney actually gained access to confidential information,

the inquiry itself might destroy the values sought to be protected by the attorney's duty of confidentiality.").[16]

Finally, the Court briefly addresses Kight's argument that his lawyer should not be disqualified based on his four-month representation of Lankford. This argument, admittedly not stressed by Kight, is troubling. A case like the Civil Action, where serious claims are made about the professional competence of co-trustees and self-dealing by fiduciaries, would compel any lawyer, especially one as experienced as Armstrong, to fully and competently investigate and understand the details, purposes, and intricacies of his clients' conduct in the matters at issue—his clients in the Civil Action being Kight *and* Lankford.[17] That

---

[16]     The Court notes that cross-examination of Lankford may require Armstrong to undermine Lankford's credibility and question him on matters that he told Armstrong in confidence during their attorney-client relationship, regardless of whether they relate to the Glen Arden Property transaction. It also may require Armstrong to discredit Lankford regarding whether he failed to disclose information he knew or to show Lankford is not telling the truth about when he learned the specifics of the Glen Arden Property transaction.

[17]     Even during Armstrong's relatively brief representation of Lankford, Armstrong advocated for the appointment of a receiver "to conduct a comprehensive forensic audit of the assets of the Bunzl Trusts and the related corporate entities," and he produced to the receiver "all statements . . . with respect to all accounts containing stocks, bonds or cash that are directly owned or controlled by the Trusts or owned or controlled by entities in which the Trusts have an ownership interest." ([45.10], [45.13]). A lawyer of Armstrong's caliber certainly would have investigated Kight and Lankford's conduct and reviewed these documents in advance. It was the receiver's forensic audit and review of WBT Properties' records that ultimately revealed the Glen Arden Property transaction.

Lankford and Armstrong would engage in confidential communications in their discussion is inevitable, and that they occurred likely are the reason Lankford refused to waive his attorney client privilege with Armstrong about the matters he then and now expects to be maintained as confidential. It is not credible for Kight now to argue that no relevant privileged and confidential communications occurred in a case like this where the issues are so intimately interrelated.

The Court concludes that the subject matter of Armstrong's representation of Lankford in the Civil Action is substantially related to the subject matter of his representation of Kight here.[18] There is an actual conflict of interest in

---

[18] Armstrong is also subject to disqualification under Rule 1.9 of the Georgia Rules of Professional Conduct. See Ga. R. Prof. Conduct 1.9(a) ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."). Kight argues that Lankford's interests are not "sufficiently adverse" to support disqualification because Kight expects him to give favorable testimony. The Government represents that Lankford will testify about what Kight told him at the time, and what Lankford later discovered, about the Glen Arden Property transaction. That Kight did not fully inform Lankford at the time he first mentioned his desire to pay off his CPIC I and CPIC II loans, supports an inference that Kight concealed from Lankford and the Bunzls the manner in which he planned to do it. Although Lankford might provide some testimony favorable to Kight, the Court concludes that Kight's interests are materially adverse to Lankford's interests, particularly in view of Lankford's consistent, unequivocal refusal to waive the attorney-client privilege or allow his former lawyers to use his confidential communications.

Armstrong's representation of Kight in this case. Armstrong, and his Firm, are subject to disqualification.

C.     Waiver

In some cases, "even where an actual conflict exists subjecting the attorney to disqualification, the client may waive this conflict of interest and elect to have the attorney continue representation, so long as that waiver is knowing, intelligent and voluntary." Ross, 33 F.3d at 1524. However, "a court need not accept a waiver of the right." Id. (citing Wheat, 486 U.S. at 162) (holding that trial courts may refuse waivers of conflicts of interest to ensure adequacy of representation, to protect integrity of court, and to preserve trial judge's interest to be free from future attacks over adequacy of waiver and fairness of trial). In Wheat, the Supreme Court stated:

> Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them . . . . Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

Wheat, 486 U.S. at 160.[19]  Thus, "where a court justifiably finds an actual conflict

_____

[19]     For this same reason, the Court rejects Kight's argument that the Government, without Lankford's permission, is precluded from seeking Armstrong's disqualification or that Lankford was required to join in the Government's Motion.  Lankford unequivocally refused to waive the

of interest, there can be no doubt that it may decline a proffer of waiver." Id. at

162.

Here, although Kight waived the conflict, the Court is not required to accept

it. Lankford refuses to waive the attorney-client privilege, "which means that the

instant case presents a stronger justification for disqualification." See Campbell,

491 F.3d at 1312; contra Ross, 33 F.3d at 1524.

Kight argues that Lankford already waived the attorney-client privilege

under the terms of the Engagement Letter. The Court disagrees. Paragraph 5 of

the Engagement Letter states:

> In consideration of [the Firm's] acceptance of this engagement,
> you agree that [the Firm] may in the future represent existing or new
> clients in any matter involving or related to you including, without
> limitation, litigation against you, and other matters directly or
> indirectly adverse to the interests of you, *so long as those matters are
> not substantially related to this representation or to any other matter
> on which you engage [the Firm].*

(Engagement Letter ¶ 5) (emphasis added). Having found that this criminal case is

---

attorney-client privilege. See Wheat, 486 U.S. at 156 (disqualifying attorney even
though witness waived conflict); Campbell, 491 F.3d at 1309 (granting
government's motion to disqualify where witness did not join motion and refused
to waive conflict); Ross, 33 F.3d at 1512 (granting government's motion to
disqualify, even where witness waived conflict); Culp, 934 F. Supp. at 399
(rejecting defendant's argument that government lacks standing to raise potential
conflict; defendant cannot waive either rights of attorney's former clients or
interest of court in integrity of its procedures and faire and efficient administration
of justice) (citing Ross, 33 F.3d at 1523-24; Wheat, 486 U.S. at 156, 160).

substantially related to Armstrong's representation of Lankford in the Civil Action,

Kight cannot rely on the waiver in Paragraph 5.

Kight next argues that the Court should find that Lankford waived the

attorney-client privilege based on Paragraph 8, which states:

> We have agreed to represent each of you, jointly, in this matter. After discussing the matter with each of you, including the advantages and risks of joint representation, we believe that joint representation is appropriate. Nevertheless, it is possible that during our representation, unanticipated facts would come to light which would make it inadvisable to continue joint representation. In such event, we might have to withdraw from the representation of one or both of you if our ability to exercise our independent judgment on behalf of each of you would be adversely affected. Under such circumstances, we reserve the right to determine in our discretion which party to continue to represent. *In the event the firm withdraws from representing either of you, both of you agree to waive any conflict arising from our continued representation of the other client adverse to you and you agree not to seek to disqualify the firm from continuing to represent the remaining client.*

(Id.¶ 8) (emphasis added). Paragraph 8, however, relates only to Armstrong's

continued representation of either Kight or Lankford in the Civil Action. That is,

"[i]n the event the firm withdraws from representing either of you, both of you

agree to waive any conflict arising from *our continued representation of the other*

*client* adverse to you and you agree not to seek to disqualify the firm *from*

*continuing to represent the remaining client*." (Id.). Under the plain language of

Paragraph 8, Lankford agreed only to waive a conflict arising from Armstrong's

*continued* representation of Kight *in the Civil Action.*[20]  Contrast S.E.C. v. King

Chuen Tang, 831 F. Supp. 2d 1130, 1147 (N.D. Cal. 2011) (in joint representation,

finding defendant gave informed written consent to representation of co-defendant

where engagement letter specifically addressed the existence of a related criminal

investigation, stating that "a conflict would result of [the client] were named as a

defendant in the parallel criminal action").  The waiver language contained in the

Engagement Letter simply does not apply where, as here, Armstrong is

representing Kight in a new criminal case separate from, but the subject matter of

which is substantially related to, the Civil Action.  Lankford has not waived the

attorney-client privilege.[21, 22]

---

[20]　　The Firm's representation of Lankford ended because Lankford's
employer's insurance company obtained new representation for him in the Civil
Action.  (Armstrong Decl. at ¶ 7).

[21]　　To the extent Kight argues that the attorney-client privilege does not exist
because Armstrong represented Kight and Lankford jointly, Kight conflates the
attorney-client *evidentiary* privilege with an attorney's ethical duties when he
previously represented a person who will be called as a witness against a current
client at a criminal trial.

[22]　　To the extent Kight claims that the Government waived its opportunity to
object to Armstrong's representation because it delayed in filing the Motion, Kight
fails to provide any authority to support denying as untimely a disqualification
motion in a criminal case, or that supports Kight's theory of "constructive notice"
of a conflict of interest.  See United States v. Morrell-Corrada, 343 F. Supp. 2d 80,
92 (D.P.R. 2004) ("*While even dilatory disqualification motions ought to be
considered by the Court when an attorney has privileged information about the
former client*, in this case, no privileged information exists. . . ."); Cox v. Am. Cast
Iron Pipe Co., 847 F.2d 725, 731 (11th Cir. 1988) (in a civil case, finding waiver is

The Court concludes that Armstrong's representation of Lankford in the

Civil Action is substantially related to the subject matter of this criminal case, and

Lankford has not waived the attorney-client privilege.  Armstrong, and the Firm,

are therefore disqualified from representing Kight in this case.  The Government's

Motion to Disqualify is granted.[23]

---

appropriate "where *the former client, having every opportunity to do so,* fails to object to a new relationship involving its former attorney"); Post-Confirmation Comm. for Small Loans, Inc. v. Martin, No. 1:13-CV-195 (WLS), 2016 WL 1274124, at *5 (M.D. Ga. Mar. 31, 2016) (finding constructive knowledge of financial condition through SEC documents); United Klans of Am. v. McGovern, 621 F.2d 152, 154-55 (5th Cir. 1980) (constructive notice of cause of action based on public press conference and congressional hearing).  "The need for upholding high ethical standards in the legal profession far outweighs the problems caused by the delay in filing the disqualification motion."  Kevlik v. Goldstein, 724 F.2d 844, 848 (1st Cir. 1984).  Where, as here, "[d]isqualification is in the public interest, the court cannot act contrary to that interest by permitting a party's delay in moving for disqualification to justify the continuance of a [breach of ethical obligations]." Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 574 (2d Cir.1973).

   The Court notes that on June 7, 2016, the Government disclosed to the defense the summary of its interview with Lankford, including that it had granted Lankford immunity.  It would have been reasonable for Armstrong to infer that Lankford would testify for the Government, and it is troubling that Armstrong failed to disclose earlier his prior representation of Lankford in the Civil Action, and that he did so only in response to the Government's inquiry.  It is disingenuous to argue that the Government's Motion should be denied as untimely.

[23]    Having found that Armstrong is disqualified based on a conflict of interest, the Court does not decide whether Armstrong would be an unsworn witness at trial warranting disqualification.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Bennett L. Kight's Unopposed

Request for Oral Argument on the Government's Motion to Disqualify Defense

Counsel [55] is **DENIED**.

**IT IS FURTHER ORDERED** that the Government's Motion to Disqualify

Defense Counsel [45] is **GRANTED**.

**SO ORDERED** this 16th day of October, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE