# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                                                1:16-cr-99-WSD

BENNETT L. KIGHT,

                    Defendant.

## OPINION AND ORDER

This matter is before the Court to determine whether Defendant Bennett L.

Kight ("Defendant") is competent to stand trial.

## I.    BACKGROUND

A.    The Underlying Proceedings Against Defendant[1]

From 1991 to May 2015, Defendant, a former partner at an Atlanta law firm,

served as co-trustee of three trusts (the "Bunzl Trusts") created for the benefit of

certain members of the Bunzl family.  ([87] at 3, 16).  Defendant also served as the

Bunzl family's attorney and managed other Bunzl family assets not held in the

trusts.  (Id.).  In 2012, the Bunzl family began questioning Defendant's

---

[1]     The facts surrounding the transactions at issue in the underlying criminal and
civil proceedings are described more fully in the Court's October 16, 2017, Order
[87], and are incorporated herein.

administration of the Bunzl Trusts and stewardship of other Bunzl assets.  As a result, on February 8, 2013, Defendant and his co-trustee, William Lankford, filed a Petition for Interim Accounting in the Superior Court of Fulton County. (Civil Action Petition [54.3]).  In their Petition, Defendant and Lankford asserted that they provided the trust beneficiaries with accountings for the trusts for 2004, 2005, 2010, and 2011.  (Id. at 9).  They sought approval of their Interim Accounting, a finding that their administration of the Bunzl Trusts was proper, and requested to be relieved of any liability based on their administration of the Bunzl Trusts.  (Id. at 9, 12).

On March 13, 2013, Frances Bunzl and the beneficiaries of the Bunzl Trusts (together, the "Bunzl Family") filed their Response, Counterclaim, and Third Party Complaint ("Counterclaim") in the civil action.  ([54.4]).  The Bunzl Family brought claims against Lankford and Defendant for, among other things, breach of fiduciary duty and fraud, based on their alleged mismanagement of, and self-dealing in, Bunzl assets, including those belonging to the Bunzl Trusts.  (Id.)  The Bunzl Family alleged that Defendant and Lankford formed various limited liability companies to conceal their theft of Bunzl assets and Defendant's self-dealing.  (Id. at 31, 35-38).  The Bunzl Family also asserted claims against Defendant's wife and Defendant's son for state law RICO violations and conspiracy.  (Id. at 74-96).

On August 1, 2014, counsel for the Bunzl Family in the civil action sent a letter to the United States Attorney for the Northern District of Georgia. ([48.9]). The letter describes the civil action and urges the Government to investigate Defendant's handling of the Bunzl Trusts and assets. (Id.). On May 11, 2015, Mr. Lankford resigned as co-trustee of the Bunzl Trusts, and on May 21, 2015, the judge in the civil action issued his order finding that, under Georgia law, good cause existed to remove Defendant from his position as co-trustee of the Bunzl Trusts.[2]

The following year, on March 16, 2016, a federal grand jury returned an indictment [1] charging Defendant with one count of mail fraud in violation of 18 U.S.C. § 1341 (Count One), and on May 18, 2016, the grand jury returned a Superseding Indictment [15] charging Defendant with, in addition to mail fraud, one count of bank fraud, in violation of 18 U.S.C. § 1344 (Count Two). The Superseding Indictment alleges that, in January 2006, Kight "used his responsibility over [Frances Bunzl's] assets to misappropriate approximately $2 million from accounts owned and held for the benefit of [Frances Bunzl]." ([15] at 1). The Superseding Indictment further alleges that "[w]ithout informing

---

[2] See May 21, 2015, Order, available online at: Georgia Business Court Opinions, Paper 346, http://readingroom.law.gsu.edu/businesscourt/346. There is no indication in the Order, nor does Defendant allege, that Defendant's removal as co-trustee was due to an alleged deteriorating mental health condition.

[Frances Bunzl], [Defendant] obtained approximately $2 million by purporting to sell [Frances Bunzl] his former personal residence [in] . . . Atlanta, Georgia." (Id.).

On February 23, 2017, Defense counsel, for the first time, raised the issue of Defendant's competency in its Motion to Stay Proceedings to Determine Competency. ([59]). On July 12, 2017, the Court appointed Dr. Daniel Marson, director of the Alzheimer's Disease Center at the University of Alabama at Birmingham, to conduct a competency evaluation pursuant to 18 U.S.C. §§ 4241, 4247. ([74]). On September 6, 2017, Dr. Marson issued his report finding Defendant competent to stand trial. ([77]). On January 18, 2018, the Court held a hearing and heard testimony from Dr. Marson, Dr. Jason King, a neuropsychologist at Atlanta Comprehensive Neurology, and Dr. Chadwick Hales, a neurologist at Emory University.[3]

B.    Defendant's Alleged Cognitive Decline[4]

In January 2008, Defendant suffered a left frontal intracranial hemorrhage. ([60.3] at 37-38). As a result, Defendant was hospitalized for three days. (Id.). By

---

[3]    Defendant also submitted declarations from his wife, Judith, and son, Robert. ([112.6] at 32-44). There are no declarations and there was no testimony offered by others about Defendant's alleged condition and claimed deterioration in recent months.

[4]    Defendant's medical records from 2016 to present are numerous. The Court attempts to summarize the primary, relevant records, but does not include a summary of each here.

late February 2008, Dr. Christopher Russell of the Peachtree Neurological Clinic reported that Defendant "showed partial resolution of the hemorrhage," and that "[h]is symptoms [] essentially resolved and he now feels back to normal." (Id. at 59).  On March 14, 2008, Dr. Maurice Hanson reported that "[s]ince being at home, [Defendant] has done well.  He has recovered almost back to his normal state, if not so.  He has had no further complaints.  He has had no weakness, ataxia, headache, or visual loss." (Id. at 61).  Dr. Hanson also reported that Defendant's "[m]emory and language functions were intact." (Id. at 62).  In May 2008, Defendant was seen by several physicians at Johns Hopkins Medicine as part of the Executive Health Program for review of his recent hemorrhage, prostate issues, decreased vision, and other chronic health problems.  (See KIGHT001753-54).  Defendant reported experiencing "total resolution of any symptoms." (Id.).  Dr. Stephen Sisson stated that Defendant "had a nice recovery" from the hemorrhage and Defendant's neurological exam was normal.  (Id.).

Nearly eight years later, in June 2016, and shortly after Defendant was indicted in the underlying criminal proceeding, Defendant was referred by defense counsel to submit to neuropsychological testing by Dr. King.  Dr. King diagnosed

Defendant with "Mild Cognitive Impairment [("MCI")], multiple domains."[5]

([112.4] at 153). Dr. King concluded that Defendant's "current level of deficient cognitive functioning is at the more severe end of the range that would be classified as MCI, and if he were to experience any further cognitive decline, he would be better classified as experiencing mild stage dementia." (Id.). Dr. King also noted, however, that Defendant was "independent with all activities of daily living, including driving and keeping track of his medications without difficulty." (Id. at 158). Dr. King wrote that Defendant's "administrative assistant has always handled their household finances" and Defendant "regularly walks for exercise." (Id.). Dr. King recommended Defendant be evaluated by a neurologist to "further assess[] . . . the etiology of his cognitive impairment, and also to discuss potential medical treatment options for his cognitive symptoms." (Id. at 161).

In August 2016, Defendant saw Dr. Angela Ashley, a neurologist, at the Grady Hospital Neurology Clinic. ([112.6] at 23). Dr. Ashley reported that Defendant "continues to be independent for all IADLs but no longer manages

---

[5]     Dr. King testified in the competency hearing that "the average period that mild cognitive impairment lasts" is "[a]pproximately seven years." (Competency Hearing Transcript, Vol. 1 [113] at 24-25); see also Braak et al., An Atlas of Alzheimer's Disease 12 The Encyclopedia of Visual Medicine Series (Mony J. de Leon ed. 1999).

finances." [6] (Id.). In her progress notes, Dr. Ashley stated that Defendant was "oriented to person, place, and time," that his level of consciousness was "alert," and that his knowledge was "good." (Id. at 24). She did note that he was "[p]ositive for confusion, dysphoric mood[,] and decreased concentration." (Id. at 23). Her report concludes that her "impression" of Defendant is that he suffers from vascular dementia and suggests that Defendant "[s]hould not manage financial affairs without supervision." (Id. at 25). Defendant visited Dr. Ashley again on November 15, 2016. ([112.6] at 26). Dr. Ashley's report noted that Defendant was "oriented to person, place, and time," and had "normal strength." (Id. at 28). Without any additional context or factual development, Dr. Ashley's report concludes that her "impression" is "[v]ascular dementia, patient unable to manage complex financial matters or make complex judgements [sic] secondary to cognitive deficits from large frontal hemorrhage in 2008." (Id. at 30).

---

[6]     This account is contradictory to Dr. King's report from only two months prior in which Defendant reported that he never managed the finances. ([112.4] at 158). Dr. Ashley also noted that Defendant and his wife informed her that after Defendant realized he "was missing important details related to his work[,] [he] subsequently retired from practice." ([112.6] at 23). This account is contradictory to Defendant's own report in a September 29, 2015, deposition. In the deposition, Defendant testified that he left his former law firm because the Bunzl Family had commenced litigation against the firm for malpractice. (See Bennett L. Kight Video Deposition ("Kight Dep."), In Re: Estate of Richard C. Bunzl, Patricia H Bunzl v. Kight, No. E-10-330 (Sept. 29, 2015) at 10:20-11:16).

On December 22, 2016, Defendant suffered three broken ribs and an "acute left small subdural hematoma"[7] when he fell while walking his dog. ([82.2] at 51). In February 2017, Defendant suffered a seizure and was admitted to the emergency room at Grady Hospital. ([82.5] at 24). The hospital report states that Defendant experienced "expressive aphasia[,]" and "confus[ion]." ([82.5] at 27, 30). The report also notes, however, that upon discharge, Defendant's speech was "clear." ([82.5] at 33). In July 2017, Defendant's wife sought, and was awarded, an unopposed guardianship/conservatorship appointment from the Fulton County Probate Court. ([112.6] at 74). The Fulton County Probate Court records show

---

[7] Dr. Marson clarified in his testimony during the competency hearing that Defendant's December 2016 hematoma "differ[ed]" from the January 2008 hematoma. (Competency Hearing Transcript, Vol. 2 [114] at 130-32). Dr. Marson explained that the December 2016 hematoma was not a continuation of the spontaneous brain bleed in January 2008 but instead a "traumatic bleed and a subdural hematoma, which happens to a lot of older adults who fall and strike their head." (Id.). Dr. Marson further explained:

> [I]n a subdural hematoma, the bleed itself does not occur deep within the brain. There are several layers of tissue that cover the brain and lie between the brain itself and the skull. . . . And generally, again, based on my experience, older adults recover well from these because, first of all, it's not in the brain matter itself. . . . And so I would disagree with the defendant's response in saying that somehow these two were intimately linked. They are the same type of event in terms of classification in that there is grossly a bleed, but the bleeds are entirely different and have entirely different consequences.

(Id.).

that a licensed clinical social worker evaluated Defendant in the course of the

guardianship proceedings.  (Id. at 70-71).  The social worker's report notes the

following:

> Presently, [Defendant] requires assistance with all his Activities of
> [Daily] Living, (ADL) as well as assistance with his ambulation due
> to poor gait and balance. . . .  He scored 17/30 on the SLUMS[8]
> indicating Dementia. . . .  Long term recall was poor while short term
> recall was less impaired.  He was not capable of calculating, problem
> solving or correctly drawing clock with correct time.

(Id. at 70).  The report is based on a review of Defendant's medical records and an

interview of Defendant's wife.  (Id.).

On August 8, 2017, Dr. Hales, a neurologist, evaluated Defendant at the

Emory Neurology Cognitive Clinic.  ([112.6] at 102).  Dr. Hales reported

Defendant was "having issues with managing medications as well as difficulty

with completing basic tasks such as using [the] TV remote, household thermostats,

personal electronics, and appliances[,]" "[h]is wife is managing the finances

now[,]" and he "is no longer driving."  ([112.6] at 103).  The report also notes

Defendant scored 26 out of 51 on his ADLs, including because he required his

meals to be prepared and served for him, did not participate in any housekeeping

---

[8]      "SLUMS," otherwise known as the St. Louis University Mental Status
Examination, is a 7-10 minute screening for cognitive function.  ([77] at 10).

tasks, did not do laundry, and was "[i]ncapable of handling money."[9] ([112.6] at 105). The report finds Defendant has "notable executive dysfunction as well as difficulty with memory." (Id. at 108). Dr. Hales concludes that Defendant suffers from Alzheimer's disease and vascular dementia. (Id.). On November 6, 2017, Dr. Hales tested Defendant's cerebrospinal fluid obtained from a lumbar puncture test, which tested positive for biomarkers of Alzheimer's disease. ([112.6] at 136). Dr. Hales's report notes that "the absolute levels of CSF biomarkers as well as amount of atrophy does not correlate well with cognitive status or provide a very good predictive marker of how quickly something will progress in the future," and that, "[o]verall, these results provide confirmation of underlying AD pathology as a contributor to [Defendant's] cognitive decline." (Id.).

C.    Dr. Marson's Independent Expert Report

In mid-August 2017, Defendant traveled to Birmingham, Alabama for two days of testing and evaluation by the Court-appointed independent expert,

---

[9]    The ADLs test appears to be the result of a questionnaire that involved asking Defendant, and his wife, whether Defendant was capable of completing such tasks as shopping, preparing food, doing laundry, and handling finances. It is unclear whether, or to what extent, Defendant or his wife provided responses to the test and it is unclear whether Defendant can or cannot complete such tasks, or whether Defendant simply never participated in these tasks in the first place. For example, as to Defendant's ability to handle finances, the report states that Defendant is "[i]ncapable of handling money." ([112.6] at 105). Previous medical records reveal, however, that Defendant never handled finances—even prior to his alleged cognitive decline. (See, e.g., [112.4] at 158).

Dr. Marson.  On September 6, 2017, Dr. Marson issued his independent expert report regarding Defendant's overall cognitive functioning and competency to stand trial.  ([77]).  The report is "based on clinical interviews of [Defendant] and his wife[,] Ms. Judith Kight, standardized cognitive, psychological and forensic testing of [Defendant], and review of multiple medical, legal, business, and other records."  ([77] at 2).  The report notes, at the outset, that because Defendant's motivation during his cognitive testing was "variable and at times suboptimal," "the cognitive testing portion of the evaluation was viewed to be invalid."  ([77] at 22-23).  Dr. Marson further notes that, as a result, Defendant's "cognitive test results . . . therefore very likely represent significant underestimates of [Defendant's] actual current level of cognitive functioning."  (Id. at 23).

Defendant's "general cognitive functioning," as measured by the DRS-2, placed Defendant in the "severely impaired range."  ([77] at 23).  In letter fluency, Defendant scored in the "severely impaired range" because he was only able to name two words beginning with the letter "A" in sixty seconds, and only five words beginning with the letter "F" in sixty seconds. (Id.).  Defendant's spatial recall over three trials was "moderately impaired," and his response on one recall trial was "highly unusual and raised validity concerns."  (Id.).  Defendant's copy of a clock face was "generally intact with some drift of numbers," but "[o]n a much

simpler test involving copying of simple shapes, he was severely impaired." (Id.).

Defendant tested in the high average range for general abstraction, and his verbal

reasoning fell in the average range. (Id. at 24). Finally, Defendant's executive

function was "moderately impaired." (Id.).

Dr. Marson also administered the Evaluation of Competency to Stand

Trial-Revised ("ECST-R") as "a forensic measure relevant to competency to stand

trial." (Id. at 24). During the administration of the test, Defendant was "open,

cooperative, and engaged," and "[s]ome of [Defendant's] responses reflected

eloquent descriptions of his understanding of legal procedures and principles as

they applied to his legal situation." (Id. at 24). Dr. Marson found that Defendant

had "no impairment" under any of the four scales that assess abilities and

knowledge relevant to competency to stand trial. (Id. at 25-27). For example,

Defendant's "responses reflected an intact working relationship with his attorney,"

Defendant could identify the roles of the different individuals involved in the

courtroom proceedings, and Defendant had "a good understanding of the charges

against him and the seriousness of the charges." (Id.). Defendant "expressed a

balanced view" with respect to whether "a jury would be for or against him,"

stating, "he believed that a jury on hearing the evidence would support him, but

acknowledging that the amount of money claimed stolen ('$2 million is a lot of

money') could weigh 'significantly against the assumption of innocence.'"[10]  (Id. at 26).

Dr. Marson made a number of clinical findings, including that (1) Defendant's medical and legal records and reported history are not consistent with a progressive memory disorder or dementia during the period June 2008 to May 2016; (2) Defendant's memory complaint in May 2016 and subsequent work-up were clinically atypical; (3) Defendant's testing with Dr. Marson revealed multiple cognitive test validity failures and other validity concerns; (4) Defendant likely does not suffer from aphasia, Alzheimer's disease, or a vascular dementia but may suffer from MCI; and (5) Defendant's possible mild depression does not impact his overall cognition.  (Id. at 28-34).  Dr. Marson concluded that Defendant is "not suffering from a mental disease or defect rendering him mentally incompetent and unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  (Id. at 34-36).

---

[10]    Although Dr. Marson refrained from noting it in his report, because he believed it would be prejudicial, Dr. Marson admitted during his testimony at the competency hearing that Defendant's statement regarding what the jury would think about his case also included Defendant stating that he "was looking for a better and quicker way out of things."  ([113] at 210).

## II.    DISCUSSION

### A.    Legal Standard

"The Due Process Clause of the Fifth Amendment prohibits the government from trying a defendant who is incompetent." United States v. Rahim, 431 F.3d 753, 759 (11th Cir. 2005) (per curiam) (citations omitted). "The test for determining competence to stand trial or to plead guilty is whether the defendant 'has sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding' and whether the defendant 'has a rational as well as factual understanding of the proceedings against him [or her]." Tiller v. Esposito, 911 F.2d 575, 576 (11th Cir. 1990) (quoting Dusky v. United States, 362 U.S.402, 402 (1960) (per curiam). "Absent evidence of an inability to assist counsel, the defendant's 'low intelligence, mental deficiency, bizarre, volatile, or irrational behavior, or the use of anti-psychotic drugs is not sufficient to show incompetence.'" United States v. Fuenmayor-Arevalo, 490 F. App'x 217, 225 (11th Cir. 2012) (quoting Pardo v. Sec'y, Fla. Dep't of Corr., 587 F.3d 1093, 1101 (11th Cir. 2009). "Whether the defendant is competent is an ongoing inquiry; the defendant must be competent at all stages of trial." Rahim, 431 F.3d at 759 (citing Drope v. Missouri, 420 U.S. 162 (1975).

The Eleventh Circuit has "identified three factors to be considered in determining whether information that a court has establishes a 'bona fide doubt regarding the defendant's competence': '(1) evidence of the defendant's irrational behavior; (2) the defendant's demeanor [during the proceedings]; and (3) prior medical opinion regarding the defendant's competence to stand trial.'" United States v. Wingo, 789 F.3d 1226, 1236 (11th Cir. 2015) (quoting Tiller, 911 F.2d at 576). Although the court "must consider the aggregate of evidence pertaining to all three prongs and not evaluate each prong in a vacuum," "evidence under a single prong of the test—even standing alone—'may in some circumstances, be sufficient' to establish a bona fide doubt about a defendant's competence." Id. (quoting Drope, 420 U.S. at 180). An expert opinion determining a defendant's competency, moreover, is not binding on the district court if there is reason to doubt it. Fuenmayor-Arevalo, 490 F. App'x at 225.

"While earlier precedent tends to the contrary, see United States v. Makris, 535 F.2d 899, 905-06 (5th Cir.1976),[11] [the Eleventh Circuit] ha[s] since decided

---

[11]    In Izquierdo, the Eleventh Circuit distinguished Makris because (1) "it involved the *government's* pre-trial motion to determine the competency of the defendant, and did not involve a *defendant's* motion to withdraw a guilty plea based on incompetency," and (2) the competency statute in Makris, 18 U.S.C. § 4244, unlike the statute here, "placed more of an emphasis on the government's role in filing an incompetency motion." United States v. Izquierdo, 448 F.3d 1269, 1277-78 (11th Cir. 2006).

that 'a petitioner raising a substantive claim of incompetency is entitled to no

presumption of incompetency and must demonstrate his or her incompetency by a

preponderance of the evidence.'" United States v. Bradley, 644 F.3d 1213, 1268

(11th Cir. 2011) (quoting Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir.

1995)); see also Fuenmayor-Arevalo, 490 F. App'x at 225 ("A defendant must

demonstrate his incompetence by a preponderance of the evidence."); Izquierdo,

448 F.3d at 1277-78 (holding that a defendant seeking to withdraw his guilty plea

based on alleged incompetence had the burden to demonstrate his incompetence).[12]

Although Defendant argues the law on this issue is unsettled in this Circuit, the

Court finds Bradley controlling here.[13] Bradley involved nearly identical facts to

---

[12]     A number of district courts in this Circuit have also applied the Bradley burden of proof standard. See, e.g., United States v. Deruiter, No. 2:14-CR-46-FTM-38MRM, 2017 WL 3308967, at *2 (M.D. Fla. Aug. 3, 2017) ("The Eleventh Circuit, addressing an appeal from a pretrial substantive competency determination, found that the burden rests with the defendant."); United States v. Raiola, No. 2:15-CR-106-FTM-38MRM, 2017 WL 218830, at *2 (M.D. Fla. Jan. 19, 2017); United States v. FNU LNU, No. 6:10-CR-238-ORL-22TBS, 2016 WL 158769, at *2-3 (M.D. Fla. Jan. 14, 2016); United States v. Richardson, No. 1:14-CR-00459-LMM, 2015 WL 4561399, at *3 (N.D. Ga. July 28, 2015); United States v. Moreno, No. 1:13-CR-0130-01-SCJ, 2014 WL 4793004, at *3 (N.D. Ga. Sept. 25, 2014); United States v. Smith, No. 1:10- CR-0102-TCB-JFK, 2011 WL 6960977, at *5 (N.D. Ga. Dec. 13, 2011), report and recommendation adopted, No. 1:10-CR-102-TCB, 2012 WL 34078 (N.D. Ga. Jan. 6, 2012).

[13]     At the conclusion of Defendant's competency hearing, the Court ordered the parties to submit briefing by January 29, 2018, addressing the following issues: (1) who bears the burden of establishing competency or incompetency; (2) what is the standard for determining incompetency; and (3) what are the criteria in

this case, including that the defendant moved for a pre-trial competency ruling citing alleged progressive dementia.  644 F.3d at 1266-67.  <u>Bradley</u> makes it clear that a defendant bears the burden of demonstrating his or her incompetency.  <u>Id.</u> This is especially true in cases where the defendant is the one moving for the competency determination.  <u>Izquierdo</u>, 448 F.3d at 1277-78.  The Supreme Court, albeit in *dicta*, has confirmed this proposition.  In <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 362 (1996), the Court, addressing the constitutionality of a state rule that required the defendant to prove his incompetency by clear and convincing evidence, as opposed to by a preponderance of the evidence, stated that "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence."  517 U.S. at 362 (citing 18 U.S.C. § 4241).[14]

B.    <u>Analysis</u>

Defendant's alleged incompetence, from defense counsel's point of view, is simple.  Defense counsel argues that Defendant's 2008 spontaneous brain

---

evaluating the standard to be applied in determining whether or not somebody is competent to stand trial.  ([111]).  Defendant's Post-Competency Hearing Brief [117] used two of nineteen pages to discuss the Court's requested issues while using the rest of the brief to argue the merits of Defendant's competency determination.  When the Court stated the specific issues to be addressed, the Court expected counsel to comply with its Order.

[14]    As the Court notes later in this Opinion, even assuming it is the Government's burden to prove competence, that burden was met on the record before the Court.

hemorrhage so severely impacted Defendant that his cognitive abilities have, since that time, progressively declined to the extent that he is no longer capable of consulting with his attorneys, and therefore is no longer competent to stand trial. ([59] at 1-2).[15] This conclusion, according to defense counsel, is, in large part, supported by Dr. King's June 2016 diagnosis of Mild Cognitive Impairment, Dr. Ashley's August 2016 diagnosis of vascular dementia, a July 2017 Fulton County Probate Court's guardianship/conservatorship appointment of Defendant's wife,

---

[15]     Defendant states his argument as follows:

> Defendant Bennett Kight is 76 years' old.  In January 2008, he suffered a major brain hematoma (i.e. a brain hemorrhage, or bleeding in his brain).   Since then, Defendant's mental capacity has declined progressively to the point where he has now been diagnosed with dementia by Dr. Angela Ashley, the Director of the Memory Assessment Clinic at Grady Memorial Hospital and an Assistant Professor in the Department of Neurology at Emory University School of Medicine.
>
> Since being diagnosed with dementia, on December 22, 2016, Defendant suffered another brain hematoma and 3 broken ribs when he fell while walking his dog.  Then, on February 6, 2017, Defendant suffered a seizure that required his admission to the emergency room. He has also been suffering from aphasia. . . .  As the Government has noted, aphasia is "an impairment of language, affecting the production or comprehension of speech and ability to read or write. . . .
>
> As a result of Defendant's mental health issues, he is no longer competent to understand the nature and consequences of the proceedings against him, or to assist properly in his defense.

(Id.).

and a revelation that Defendant's cerebrospinal fluid contains biomarkers indicative of Alzheimer's disease, as reported by Dr. Hales in November 2017.  Id.

The Court has carefully reviewed and considered Defendant's medical and psychological records and the declarations of Defendant's wife and son, but finds Defendant's interpretation and advocacy based on this evidence inconsistent and suspect.  Defendant's claim of a progressive deterioration beginning with his intracranial hemorrhage in January 2008 is contradicted by the details in his medical examinations and by the actions of Defendant and his wife after January 2008.  The record demonstrates that Defendant's doctors and his family found Defendant made a full recovery within months of his January 2008 hemorrhage. Not until eight and a half years later, and shortly after Defendant was indicted in the underlying criminal proceedings in this matter, did Defendant report any concerns regarding a cognitive decline.  There are no medical reports in the record between January 2008 and June 2016 that identify any memory issues or the suspicion of overall cognitive or functional decline.  There is no evidence Defendant suffered additional brain hemorrhages or other brain-related injuries during this time.  There is no evidence that Defendant suffered similar onset symptoms as those experienced in January 2008.  There is also no evidence—aside from Defendant's wife's accounts reported to medical professionals from June

2016 onward—that Defendant suffered persistent symptoms resulting from the 2008 hemorrhage, or any other cognitive or functional impairment, during this time period.[16]

The record evidence shows that Defendant has taken positions in other court proceedings that discredit his current claim of incompetency. Defendant asserted in 2015 that he was capable to remain co-trustee of the Bunzl Trusts until he was removed for cause by Judge Melvin Westmoreland of the Superior Court of Fulton County on May 21, 2015. Defendant participated in civil litigation proceedings for almost four years prior to his post-indictment June 2016 MCI diagnosis with no evidence or allegation of any competency issue. On September 29, 2015, Defendant was deposed in the civil litigation proceedings involving disputes over the Bunzl assets. (See generally Kight Dep.). Defendant's testimony over a day long deposition was careful, thoughtful, deliberate, controlled, and his memory good, including of events over a decade before the deposition took place. Defendant asked questions to be repeated when unclear, listened carefully to his

---

[16]    Defendant's wife and administrative assistant, Linda Stadel, prepared memoranda in May 2016 discussing Defendant's supposed cognitive decline in the preceding years. Defendant's wife admitted in her interview with Dr. Marson, however, that Defendant's attorneys encouraged the memoranda be prepared— presumably for use in future litigation regarding Defendant's competency. ([77] at 6, 18). The Court therefore accords little weight to these accounts because of the potential underlying bias.

counsel's objections, and limited his responses to the precise question asked. His demeanor was calm and he even disagreed at times with certain characterizations of his testimony. Defendant clearly articulated the facts of the case and other details regarding his role at his former law firm. Defendant recalled numerous details, including the year he graduated from law school, when he started working for his former law firm, and what his job duties involved in the early 1970s. (Id. at 12:03-13:08). Defendant described specifics regarding his roles, positions, and job duties over a period of 50 years at his former law firm. (Id. at 12:03-14:16). Defendant confirmed that he worked as "of counsel" at his former law firm until July 2015—eighteen months before he alleged he was not competent to stand trial in this Court. (Id. at 10:20-11:16). Defendant also testified that he left his former law firm only because the Bunzl Family filed a lawsuit against the former firm alleging malpractice, and not because of any decline in his cognitive health. (Id.). Finally, when asked why he would not resign as executor of Richard Bunzl's estate he stated, "Because I don't have any reason to resign." (Id. at 24:02-24:07).

Defendant's 2015 deposition testimony comports with Dr. Marson's report of his interview of Defendant that he was "open, cooperative, and engaged" and that some of "his responses reflected eloquent descriptions of his understanding of legal procedures and principles." ([77] at 24). Although the medical records from

June 2016, onward show that Defendant suffered a number of health issues in recent years, they fail to accurately reflect Defendant's current cognitive condition. The medical records, in large part, rely heavily on the accounts of Defendant's wife—an individual with a substantial interest in protecting her husband from a federal criminal conviction or potential incarceration—in reaching their medical conclusions.  For example, Dr. King's neuropsychological report states that the "examinee was interviewed along with Judith Kight, his wife."  ([82.3] at 6).  Dr. King's report includes the following statements:

> His wife said that during the past several years he has experienced significant problems remembering short-term information, such as events and conversations that have occurred recently.[17]  She has also noticed that he has experienced significant deterioration in his ability to think, reason, and problem-solve, compared to his former level abilities.  She said that it seems as though he can no longer effectively process complex information, nor can he multitask effectively.  According to his wife, this represents a significant change compared to his prior abilities, as he was formerly adept at handling very complicated financial and real estate transactions for many years in his work as an attorney.

(Id. at 7).  Dr. Angela Ashley's records include similar accounts from Defendant's wife, including the following description:

---

[17]    This statement by Mrs. Kight is entirely inconsistent with the fact that Defendant continued during these years to engage in private law practice and is inconsistent with the deposition testimony Defendant gave on September 29, 2015.

He is accompanied by his wife who assists with the history.[18] She
reports that Mr. Kight has become increasingly irritable as he has
become more aware of his deficits. For example, he recently
misplaced an item after a trip, accused her of having lost it, became
very irritable and accusatory, then did not remember how the item got
to the place she showed him where he had left it.[19]

([82.3] at 42).

The medical records include, to an important extent, the recording of

Defendant's medical history based on the hearsay or double hearsay of other's

medical records without independent verification of reports provided by Mrs.

Kight, resulting in unreliable and contradicted history information. For example, it

was reported to Dr. King in mid-2016 that Defendant's "administrative assistant

has always handled their household finances." ([112.4] at 158). But, in Dr.

Ashley's report only a couple of months later, and then in Dr. Hales's report nearly

one year later, Defendant was reported to be "incapable of handling money." (See,

---

[18]     A significant portion of information provided to the health care professionals
and the Court were provided by Mrs. Kight. Shortly before the Competency
Hearing, the Court required Defendant to provide various information about
Defendant's daily activities. ([101] at 1-2). Answers to the information ordered to
be provided were all provided by Mrs. Kight, including information about material
Defendant has read over a three month period, along with her commentary
regarding why he read the materials described. (Defendant's Response to the
Court's January 4, 2018, Order [101] (sent to the Court via email) at 5-6; [113] at
127). Notable, however, is that among the books Defendant "opined" on his iPad
are Grant, by Ron Chernow, The Last Lion (Volume 2), by John Feinstein, and
Destiny of the Republic, by Candice Millard. The Court notes that it is possible to
determine on an iPad how much of a book was accessed by the user.
[19]     This memory lapse is unremarkable.

e.g., [112.6] at 105; [112.6] at 105). Dr. Ashley's August 2016 report also noted that Defendant and his wife informed Dr. Ashley that after Defendant realized he "was missing important details related to his work[,] [he] subsequently retired from practice." ([112.6] at 23). This account is contradicted by Defendant's own testimony in a September 29, 2015, deposition in which Defendant testified that he left his former law firm because the Bunzl Family had commenced litigation against the firm for malpractice. (See Kight Dep. at 10:20-11:16).

Later medical records also appear largely influenced by earlier records, including, importantly, by Dr. King's and Dr. Ashley's initial reports diagnosing Defendant with MCI and vascular dementia, respectively. That is, at least in some instances, it is clear that a treating physician reviewed a previous report, relied upon it, and made his or her diagnosis based on the earlier report. Such an approach would seem to be, generally, the most pragmatic way to evaluate a patient. Here, however, it appears to have created a "snowball" effect that likely caused and perpetuated a false understanding of Defendant's true cognitive condition. (See, e.g., [73.1] at 23-24; [73.5] at 30; [73.6] at 49). For instance, Dr. Hales admitted in his testimony during the competency hearing that when assessing and diagnosing Defendant, he wholly relied upon the medical reports of some of Defendant's treating physicians, including Dr. Bragg, without further

review of the records supporting those reports and independent inquiry. ([114] at 181-82). But, Dr. Bragg's notes state that he reviewed, and relied upon, "some neuropsychological test results, June 1st of 2016"—presumably Dr. King's report. (Id.). Dr. Hales's testimony also substantiates the conclusion that Defendant and his wife controlled the information provided to medical practitioners. When asked by the Court if he was told during Defendant's initial visit that Defendant had been indicted, Dr. Hales stated that he had not been told about the indictment and acknowledged a pending indictment could influence how a patient would answer test and interview questions. ([114] at 168-70). Dr. Hales also observed, however, that "nothing in any of [his] interactions either at the clinic visit or when [Defendant and his wife] came for the lumbar puncture . . . suggested that that was the case." (Id. at 170).[20]

Dr. Marson was identified by the Court as an individual with experience to conduct a competency evaluation, including because he was independent of any party in the case. Dr. Marson's examination was exhaustive and his report,

---

[20] To the extent Defendant argued his fall on December 22, 2016, and resulting hematoma contributed to his claimed cognitive deterioration, Dr. Hales testified that the hematoma resolved and did not present any indication of cognitive impairment.

accompanied by his testimony at the competency hearing, was comprehensive.[21]

According to Dr. Marson, Defendant did not show any impairment on the standard examination administered to determine Defendant's competency to stand trial. ([77] at 24-27). Defendant demonstrated that he was able to consult with his attorneys and possessed a factual and rational understanding of the courtroom proceedings and a rational understanding overall. (Id.). For example, Defendant identified Barry Armstrong and Rachel Cannon as his attorneys, explained the role and duties of the prosecutor, had a "good understanding" of the nature and seriousness of the charges against him, and articulated why he would not accept a plea bargain but that he understood that the amount of money involved in the transaction could well influence the jury. (Id.).

Dr. Marson reported notable and serious validity concerns with Defendant's cognitive test results. ([77] at 22-23). Dr. Marson stated that "there were three instances of cognitive test validity failures, as well as additional unusual test responses and discrepancies, including discrepancies between Defendant's test

---

[21]     Defendant argues that Dr. Marson was not qualified under Daubert to opine on Defendant's cognitive test results because they were unreliable. ([117] at 10). The Court finds that Dr. Marson is experienced and competent to offer an opinion on the invalidity of Defendant's test result. Dr. Marson provided support for the bases of his opinions, including at the competency hearing, and that the opinions offered are consistent with use and interpretation of the test results in his area of expertise. Defendant cross examined Dr. Marson vigorously, including on his validity test interpretation, for about 6 hours.

performance and his presentation in interview." ([77] at 22). The three validity tests Defendant failed included the Test of Memory Malingering ("TOMM"), the Rey 15 Item test, and the dot-counting test. ([113] at 29). For example, Dr. Marson found Defendant's dot counting test "highly indicative in [his] clinical judgment of noncredible responding." ([113] at 189-90). The following is an excerpt of Dr. Marson's explanation of the dot counting test results at the hearing:

> So the first card is the first of the ungrouped dots, and you will see that there are eleven dots there. [Defendant] reported that there were 26 dots on this page. The next card is Card 6 of the ungrouped dots again, and you will see there are seven dots. [Defendant] said that there were 26 dots on this page. . . . Now, if you move to the next card, which is Card 7, you will see this is the first of the group dot cards, and you can see that there are twelve dots there, but they are grouped in terms of two dots and then sets of five, so it facilitates the counting. On Card 7, [Defendant] said there were 31 dots on this page, and it took him a minute and eighteen seconds to arrive at that answer.

(Id. at 188-89).[22] As for the TOMM test results, Dr. Marson explained that Defendant tested below the 45 cut score threshold on all three trials. ([113] at

---

[22] Dr. King testified that the three validity tests Defendant failed are inappropriate to use with individuals who have been diagnosed with dementia because they have "a high rate of false positive errors, which would mean that they wrongly classify the person as giving poor effort or malingering when the individual with dementia is actually unable to pass them." ([113] at 29). Dr. King testified that, even if the score cutoffs were adjusted for patients with dementia, they still "would not work well in patients with dementia." (Id. at 32). Dr. Marson disputed Dr. King's opinion, testifying that "to say because someone is diagnosed with dementia or could have dementia these tests become off-limits would defeat

200-01).  Dr. Marson stated that because the TOMM "sometimes can lack

sensitivity," he also administered the Albany Consistency Index ("ACI"), "which

is a different way of looking at the TOMM's results."  (Id. at 201).  Dr. Marson

found that Defendant had a score of 23 on the ACI, "which is well above the

threshold for suspect effort."  (Id. at 202).

Defendant also provided a "highly improbable and bizarre response that

[Dr. Marson] [had] not seen in 27 years of practice" during Defendant's spatial

memory test, which is a "true cognitive test" and not a "specific validity test."  (Id.

at 202-03).  The test involves an examiner presenting a stimulus to the subject for

ten seconds, which is essentially a six-by-six grid with circles on it.  (Id.).  The

examiner then removes the stimulus, presents the examinee with a grid with no

objects on it, and gives the examinee ten checkers to duplicate the pattern

previously shown.  (Id.).  In one trial, Defendant arranged all of the checkers in

two rows.  Dr. Marson found this "suggestive of noncredible effort" because

"[Defendant] had seen this array, and yet he arranged all the checkers in this neat

_____

the purpose of using these tests."  ([113] at 196).  Dr. Marson explained that the
dot-counting test, for example, provided a sample of test scores for individuals
with true mild dementia, and that Defendant's score was 33 times the standard
deviation of a mild dementia group.  (Id.).  Dr. Marson further stated that the
E score cutoff for mild dementia patients is 22; "[i]n other words, scores above 22
become indicative of likely suspect effort."  (Id. at 196-97).  Defendant scored a
148.  (Id. at 197).

two rows."[23]  (Id. at 203).  Dr. Marson also found that Defendant's test

performance on his phonemic and semantic fluency tests, where he was asked to

generate as many words as he could within the phonemic categories of "F," "A,"

and "S," were also not credible.  (Id.).  For example, Defendant only generated two

words beginning with "A" in sixty seconds.  (Id.).  Dr. Marson testified that "this

was entirely discrepant with the rich, articulate, fluent, spontaneous speech that

[Defendant] generated or demonstrated in interview and on tests like the ECST-R."

(Id.).

Finally, a thorough review of the medical records and hearing testimony

brings forth one additional, and important, point.  That is, a pathophysiological

diagnosis of Alzheimer's disease does not itself support the presence of clinical

manifestations of the disease.  In other words, just because Defendant tested

positive for biomarkers of Alzheimer's disease in November 2017, does not mean

he is now exhibiting clinical symptoms of a severely, or even moderately, impaired

Alzheimer's disease patient.  Dr. Hales's report acknowledges this fact, stating,

"the absolute levels of CSF biomarkers as well as amount of atrophy does not

---

[23]    At the competency hearing, defense counsel raised the issue that the validity
tests that Defendant failed were visually-based and that Defendant's glaucoma
likely impacted these results.  Dr. King acknowledged, however, during his
testimony that glaucoma does not impact visual acuity.  ([113] at 106).  The Court
thus finds that these visually-based tests substantially reflect Defendant's
performance.

correlate well with cognitive status or provide a very good predictive marker of how quickly something will progress in the future." ([112.6] at 136). During the competency hearing, Dr. Marson confirmed Dr. Hales's account, stating:

> [T]his is a critical distinction I think in this case is that someone can have biomarker evidence of Alzheimer's disease but never develop clinical symptoms of Alzheimer's disease in their lifetime. And so although biomarkers are a tremendous advance for us in the field, they do not indicate by themselves whether or not someone has clinical Alzheimer's disease. And it's clinical Alzheimer's disease that will impact cognition, everyday function, and ultimately capacities of various kinds.

([113] at 150-51).

Considering all of the evidence before it, and applying the factors to be considered in evaluating a Defendant's competency, including Defendant's attentiveness during the competency hearing and his expressions from time to time that he agreed or disagreed with the testimony presented, the Court finds that Defendant has failed to show, by a preponderance of the evidence, that Defendant lacks "'sufficient present ability to consult with his . . . lawyer with a reasonable degree of rational understanding'" and "'a rational as well as factual understanding of the proceedings against him." Tiller, 911 F.2d at 576 (quoting Dusky, 362 U.S. at 402); see also United States v. Wingo, 789 F.3d at 1236. Defendant advances no evidence that he suffered a progressive cognitive deterioration following his January 2008 hemorrhage—in fact, evidence such as Defendant's

September 29, 2015, video deposition and physician evaluations establish that Defendant has lucid, thoughtful, articulate, and substantial memory recall.

Defendant's cognitive testing with Dr. Marson, moreover, revealed multiple cognitive test validity failures and other validity concerns. On the totality of the record here, the Court finds further that even if it was the Government's burden to prove that Defendant is competent to stand trial—which the Court finds it is not— the record, including Dr. Marson's report and testimony, substantially supports that Defendant is competent to stand trial. "Absent evidence of an inability to assist counsel," Defendant's alleged "mental deficiency . . . is not sufficient to show incompetency.'" Fuenmayor-Arevalo, 490 F. App'x at 225 (quoting Pardo, 587 F.3d at 1101.

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Bennett L. Kight is found competent to stand trial and this case shall be processed for trial.

**SO ORDERED** this 2nd day of February, 2018.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE